Done and entered at Sioux Falls, South Dakota, this 29th day of September, 1978.

**Louis R. and Yvonne M. FREDERICK, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Ingolf G. and Judith SIMLEY, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Nos. A2–76–51, A2–76–52.**

United States District Court, D. North Dakota, Northeastern Division.

Sept. 29, 1978.

---

Garry A. Pearson, Pearson & Christensen, Grand Forks, N. D., for plaintiffs.

Albert R. Hausauer, Sp. Asst. Atty. Gen., for State Tax Commissioner, Bismarck, N. D., for amicus curiae.

Gary Annear, Asst. U. S. Atty., Fargo, N. D., Jeffrey D. Snow, Tax Atty., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

PAUL BENSON, Chief Judge.

The above-entitled actions were consolidated for trial to the court. Both actions were brought under 28 U.S.C. § 1346(a) for refund of income taxes assessed against and paid by the respective taxpayers for the years 1971 and 1972. The issues presented are whether the travel expenses incurred by the husband taxpayers in each case while working on construction of the Safeguard Ballistic Missile Defense Facilities in northeastern North Dakota are deductible, and if so, whether the taxpayers have adequately substantiated the expenses in question.

### I. FACTS

#### A. The Project

Morrison-Knudsen Company acted as the general contractor for construction of the Safeguard project, under an agreement with the Army Corps of Engineers. The project headquarters were located at Langdon, North Dakota. The two primary construction sites were the Missile Search Radar (MSR) Site near Nekoma and the Perimeter Acquisition Radar (PAR) Site near Concrete. In addition, there were four remote missile sites in the surrounding area.

Construction began in April 1970. Workers for the project were hired by Morrison-Knudsen through referrals from local union halls. Morrison-Knudsen had entered into stabilization agreements with the unions, governing wages and working conditions. There were no provisions for length of employment or for hiring and firing practices.

Because the project was built in a rural area, the influx of hundreds of construction workers produced a severe shortage of housing and other facilities. Temporary housing and mobile home courts were constructed for Army Corps of Engineers personnel and Morrison-Knudsen supervisory personnel, but no housing was provided for the construction workers. The local union representatives had requested construction of a "work camp," consisting of temporary housing and eating facilities for the workers, but they were unable to negotiate this as part of the stabilization agreement. Instead, many of the workers received a per diem payment for "travel and subsistence." Morrison-Knudsen placed no restrictions on the spending of these payments or on where the workers could live. The only requirement was that the workers had to report to the jobsite on time each day.

Throughout the construction of the Safeguard facilities, Morrison-Knudsen and the subcontractors could provide only rough estimates of the number of workers that would be needed at any given time. The unions solicited workers from a several state area. Many potential workers were reluctant to accept employment on the project for several reasons.

The lack of availability of adequate housing was one reason. Throughout the construction project, hotels and motels in the area were filled to capacity. Rental housing units were almost nonexistent. Many private homeowners rented spare sleeping rooms to construction workers, and in some cases cots were set up at night in basements

and even in some business establishments. Every village within driving distance was affected, including many communities in western Minnesota and southern Canada as well as in North Dakota. Long waiting periods were encountered daily in restaurants throughout the area.

Another reason for the reluctance of workers to accept employment on the project was the potentially short duration of employment. As construction progressed, different types of workers were needed and excess workers who were no longer needed were laid off. "Change orders," or revisions in construction plans for the project, occurred almost daily and resulted in an unusually large turnover of workers. Temporary layoffs often occurred because of shortages and late shipments of materials.

The largest reductions in work force occurred at the onset of winter. Because of the length and severity of North Dakota winters, the construction industry is highly seasonal. Only a relatively small number of workers were retained through the winter, and they were reassigned to maintenance or indoor construction work. One of the union representatives testified that even if a worker was retained during the winter, there was no assurance that he would still have a job the next summer, and much less that he would be retained through another winter.

There was also a great deal of uncertainty whether construction of the project would ever be completed. Originally ten Safeguard projects were planned in areas scattered throughout the country. Some were terminated before construction had even begun. The projects near Boston, Massachusetts and Great Falls, Montana were terminated in the early stages of construction. Rumors of a similar early termination of the project in North Dakota were circulated throughout the period of construction.

The North Dakota project was the only one on which construction was completed.

The project was dedicated on October 1, 1974, and was in operation for only that one day. Dismantling of the project began on October 2, 1974.

### B. Louis Frederick

Louis Frederick is a carpenter who has lived in Belcourt, North Dakota, all of his life. He is married and has five children who attend school in Belcourt. His wife is employed as a nurse's aid in a hospital near Belcourt. The Fredericks own their home in Belcourt.

Frederick was hired as a carpenter by Morrison-Knudsen on May 22, 1970,[1] through Local 2028 of the Carpenter's Union in Grand Forks, North Dakota. He had been unemployed for approximately one month and had been unable to find employment in the Belcourt area.

He was assigned to the MSR Site near Nekoma. When he was hired, no one told him how long the position would last. Because carpentry work in North Dakota is seasonal, he did not consider moving his family closer to the jobsite. He was unable to find a motel room, so he slept in his car for a few nights. Thereafter, he stayed at home in Belcourt and drove to and from work each day. He testified that his daily round trip was 162 miles.

There were several carpentry crews working on the project, each having fifteen to twenty workers during the summer season. The members of the crews did not remain intact, and Frederick was shifted from crew to crew as the workload necessitated. He did not expect to work through the winter, but when most of the other carpenters were laid off for the season, he was selected to work through the winter.

He resumed working on a crew again in the spring, and was selected to work again the next winter. He was laid off on May 25, 1973, after working continuously on the project for approximately 36 months. He did not return to work on the project. There were two carpenters still working on the project when he left.

---

1. Frederick testified that he began working for Morrison-Knudsen on May 22, 1970, but Morrison-Knudsen's employment records indicate his original employment date as August 25, 1970.

While he worked on the project, Frederick received a per diem payment of $8.00. He claimed a $3,000.00 deduction for mileage expense on his 1971 tax return,[2] less the amount of $1,989.00 which he had received in per diem payments,[3] for a net deduction of $1,011.00. On his 1972 return he claimed a deduction of $2,976.00 for mileage expenses, less the amount of $1,989.00 received in per diem payments, for a net deduction of $987.00. These deductions were taken on the basis of a per mile allowance rather than for actual amounts expended for gasoline and maintenance.

When Frederick consulted an attorney for preparation of his returns, he gave the attorney the receipts he had kept for gasoline and other expenses. He destroyed these receipts after the returns were prepared.

His mother testified, for purposes of corroboration, that she lives next door to Frederick, and that she saw him leave for work each morning and return home in the evening.[4]

Ike Wetzel, the local business agent for the carpenter's union who referred Frederick to the Safeguard project, testified that to his knowledge, none of the construction workers gave up their residences and moved their families to the area of the Safeguard project.

He testified that there were several types of carpentry crews, such as form crews and finishing crews. When there was no work for a particular crew, its members would either be laid off or transferred to another crew if needed there.

He testified that when a carpenter was laid off, he had to check in with the union hall and his name was placed at the bottom of the list of workers for hire. During the summer months, he would usually be referred back to another jobsite on the Safeguard project or to another project within one or two weeks.

He further testified that in 1970 about 100 carpenters were hired for the project and 80 percent of them were laid off for the winter. The number of carpenters working on the project rose to 400 during the summer of 1971 and 50 percent were laid off for the next winter. During the summer of 1972 the number of carpenters on the job reached 500, and again 50 percent were laid off during the winter.

He also testified that there were many carpenters from the Belcourt area working on the project, and he attempted to arrange for public transportation from Belcourt to the jobsite, but was unable to do so.

## C. Ingolf Simley

Ingolf Simley is now retired but worked as a heavy equipment operator and mechanic. He has lived in Mayville, North Dakota for thirty years, is married and has two children still living at home. His wife has been employed at Mayville State College for 27 years.

Prior to his employment with Morrison-Knudsen, he had been seasonally unemployed for two or three months and had been unable to find employment in his field near Mayville. He was hired as a mechanic-welder for the Safeguard project through Local 49 of the International Union of Operating Engineers in Grand Forks. He began working at the project on April 14,

2. Although Frederick incurred only mileage expenses, the amount of his claimed travel expenses appears on his 1971 Form 2106 (Employee Business Expense) on the line for "meals and lodging," and on his 1972 Form 2106 the amount of his claimed travel expenses appears on the line for "airplane, boat, railroad, etc., fares." The court accepts Frederick's testimony that this was merely an error on the part of the preparer of his tax returns.

3. The actual amount shown on Frederick's W-2 Form (Wage and Tax Statement) as the total of his per diem payments for that year was $1,988.50. The court will use the figure of $1,989.00 that appears on the tax return in its determination of any allowable deduction, because the use of that figure had the effect of decreasing Frederick's claimed deduction by 50 cents.

4. Frederick's wife Yvonne was hospitalized at the time of trial, so his mother testified in her place to corroborate his expenses.

1970, and was assigned to the PAR Site at Concrete. After working there for two weeks, he was assigned as a master mechanic and received an increase in wages.

In October, 1970 he was transferred to the MSR Site near Nekoma. He was assigned as a mechanic and his wages were decreased. Late in the summer of 1971 he was again assigned as a master mechanic.

In the fall of 1970 and again in the fall of 1971 he was selected to work in maintenance during the winter. He was discharged on April 11, 1972, after 24 months of employment, because he refused to work the night shift.

Throughout his employment he stayed near the jobsite during the week and returned to Mayville every weekend. While he worked at the Concrete jobsite, he stayed in a hotel room for two weeks and then rented a small apartment in Cavalier, North Dakota. Upon his transfer to the Nekoma site, he rented a sleeping room in a farmhouse. When the roads became almost impassable in the winter, he moved to a room in a private home in Langdon. The next spring he purchased a travel trailer and rented parking space on a farmyard. He stayed in this trailer until he completed his employment.

He received an $8.00 per diem payment for travel and subsistence.

Simley lost many of his expense receipts before preparing his 1971 and 1972 tax returns, so he estimated that his expenses were $14.00 per day, and he claimed net deductions in both 1971 and 1972 of $6.00 per day. The deduction claimed for meals, lodging and travel in 1971 was $1,662.00, and in 1972 he claimed a deduction of $954.00.

He produced cancelled checks at trial to substantiate some of his expenses. He testified that he purchased his trailer in 1971 for $700.00, and he sold it sometime after leaving his employment on the project and received $300.00. He further testified that he bought a new pickup truck about ten days before he began working for Morrison-Knudsen and used this truck exclusively for travel to the jobsite during the week and to Mayville on weekends. He stated that at the end of his employment the vehicle had been driven 40,000 miles, but he had not checked the mileage each year.

Mrs. Simley testified that her husband returned home to Mayville on weekends. After he moved into the trailer he prepared many of his meals there, but he purchased his groceries near the jobsite and she could not testify as to the amounts he spent for meals. She further testified that she had not checked the mileage on the pickup truck because she took her husband's "word for it."

Arden Grundvig, the business agent for the operating engineers union who referred Simley to the Safeguard project, testified that the average length of employment of operating engineers throughout the project was three months.

He further testified that because the ground was frozen during the winter, the primary job on the project for operating engineers during the winter was maintenance.

He further testified that when an operating engineer was laid off, he had to re-register at the union hall and his name was placed at the bottom of the hiring list. When the worker's name reached the top of the list, he would be referred back to the Safeguard project or to another project.

## II. DEDUCTIBILITY

The deductibility of the expenses incurred by the taxpayers in this case is controlled by § 162 of the Internal Revenue Code, 26 U.S.C. § 162, which provides in pertinent part:

(a) There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \*

(2) travelling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances)

while away from home in the pursuit of a trade or business; . . .

The expenses incurred by Ingolf Simley, if deductible, are deductible under § 162(a)(2) as travel expenses incurred while away from home in the pursuit of a trade or business.

■ In *Commissioner of Internal Revenue v. Flowers,* 326 U.S. 465, 470, 66 S.Ct. 250, 90 L.Ed. 203 (1946), the Supreme Court held that three requirements must be met before a deduction of unreimbursed travel expenses will be allowed under § 162(a)(2): (1) The expenses must be reasonable and necessary; (2) they must be incurred while the taxpayer is "away from home;" and (3) they must be incurred while in the pursuit of a trade or business. Failure to meet any of the three requirements will result in disallowance of the deductions.

The taxpayer in *Flowers* was a lawyer who maintained his residence in Jackson, Mississippi, and served as general counsel to a railroad with headquarters at Mobile, Alabama. The travel expenses at issue were incurred during seventy-three trips from the taxpayer's residence to the railroad's headquarters. The Court concluded the travel expenses were not deductible because they were incurred for the taxpayer's personal convenience and not as a result of the exigencies of his employer's business.

In *Peurifoy v. Commissioner of Internal Revenue,* 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30 (1958) (per curiam), *aff'g* 254 F.2d 483 (4th Cir. 1957), the Court applied an exception which had been engrafted on its "exigencies of business" rule by the Tax Court. This exception allows a deduction of travel expenses, even though not incurred for the benefit of the employer, if the taxpayer is employed away from his home for a "temporary" rather than "indefinite" or "indeterminate" duration.

The most troublesome element in the application of the *Flowers* test has been the term "away from home." In order to promote the ease and consistency of application of this requirement, the Commissioner has developed the concept of "tax home," tak-

ing the position that a taxpayer's home for tax purposes is his place of business. The Supreme Court has not addressed the validity of this concept. Some courts of appeal have adopted it and others have rejected it. The Eighth Circuit has adopted the tax home concept, stating that the word "home" as used in § 162(a)(2) means "the place where one has his principal place of duty, and where he has an abode while pursuing such duty;—not where he merely claims his 'residence' to be." *Cockrell v. Commissioner of Internal Revenue,* 321 F.2d 504, 507 (8th Cir. 1963). *See also Jenkins v. Commissioner of Internal Revenue,* 418 F.2d 1292 (8th Cir. 1969) (per curiam).

■ When the tax home concept is read together with the "temporary-indefinite" test applied in *Peurifoy,* the resulting test is that a deduction will be allowed under § 162(a)(2) only when a taxpayer has an established principal or usual place of employment and he incurs travel expenses while temporarily employed elsewhere.

■ Automobile expenses incurred through daily travel to and from a taxpayer's place of employment are not deductible under § 162(a)(2), because the taxpayer does not meet the requirement of being "away from home." In *United States v. Correll,* 389 U.S. 299, 303–04, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967), the Supreme Court in effect adopted the Commissioner's position that the term "away from home" as used in § 162(a)(2) requires an overnight stay, or at least an absence from home long enough to require rest or sleep. However, under limited circumstances a deduction will be allowed for automobile expenses incurred in daily travel to and from work under § 162(a) generally as an ordinary business expense. One such circumstance is daily travel to and from a temporary work site. However, if the taxpayer's employment is not found to be temporary, his daily travel expenses are non-deductible personal commuting expenses, regardless of the necessity of incurring those expenses. *Sanders v. Commissioner of Internal Revenue,* 439 F.2d 296, 299 (9th Cir.), *cert. denied,* 404 U.S. 864, 92 S.Ct. 55, 30 L.Ed.2d 108 (1971);

*United States v. Tauferner,* 407 F.2d 243, 245–46 (10th Cir.), *cert. denied,* 396 U.S. 824, 90 S.Ct. 66, 24 L.Ed.2d 74 (1969). Thus, the expenses incurred by Louis Frederick, if deductible, are deductible under § 162(a) as ordinary business expenses.

Although the deductions claimed by the taxpayers in the cases before the court, if allowable, come within different provisions, both cases will turn on whether the taxpayers' employment at the Safeguard project was temporary or indefinite. The applicable test was announced by the Court of Appeals for the Eighth Circuit in *Cockrell v. Commissioner of Internal Revenue,* 321 F.2d 504 (8th Cir. 1963):

> "Where it appears probable that a taxpayer's employment outside the area of his regular abode will be for a 'temporary' or 'short' period of time, then his travel expenses are held to be deductible; conversely, if the prospects are that his work will continue for an 'indefinite' or 'intermediate' or 'substantially long' period, then the deduction is disallowed."

*Id.,* at 507, *quoting Wright v. Hartsell,* 305 F.2d 221, 224 (9th Cir. 1962).

Plaintiffs urge the court to reject the "temporary-indefinite" test as too mechanical and to apply the following test: "Should the taxpayer have, under the circumstances, moved his home and family closer to the jobsite?" In advancing this test, plaintiffs rely on *Harvey v. Commissioner of Internal Revenue,* 283 F.2d 491 (9th Cir. 1960); *Rosenspan v. United States,* 438 F.2d 905 (2d Cir.), *cert. denied,* 404 U.S. 864, 92 S.Ct. 54, 30 L.Ed.2d 108 (1971); *Six v. United States,* 450 F.2d 66 (2d Cir. 1971); and *Markey v. Commissioner of Internal Revenue,* 490 F.2d 1249 (6th Cir. 1974). The test applied in these cases turned on whether it would have been reasonable under the circumstances to expect the taxpayer to move to the location of his jobsite. However, the court notes that in all of these cases, the courts applying the test first determined whether the employment in question was temporary or indefinite. If the taxpayer's employment was found to be temporary, then he could not have reasonably been expected to move his residence; if, on the other hand, his employment was found to be indefinite, he could have reasonably been expected to move. The determination in these cases of whether the taxpayer's employment was temporary or indefinite was based on a test very similar in application to the Eighth Circuit test applied in *Cockrell, i. e.,* whether it was reasonably foreseeable to the taxpayer that his employment would last for a short time, or that it would last for a substantially long period of time.

In the cases before the court, the taxpayers were never given an indication of how long their jobs were expected to last. Although this might render their employment indefinite in the common usage of the word, it is not dispositive of whether the employment was indefinite for purposes of deductibility of travel expenses. When the taxpayers accepted employment at the Safeguard project, it could not have reasonably been foreseen that their employment would last beyond the summer season. The construction industry in North Dakota is seasonal, and during the winter months Morrison-Knudsen retained only the number of employees it needed to handle maintenance and indoor construction work. At best, plaintiffs had mere hopes of being retained through the winter.

Defendant contends that even if plaintiffs' employment was temporary when they first accepted employment on the project in 1970, their employment became indefinite before the 1971 and 1972 taxable years in question. With respect to Ingolf Simley, defendant argues that upon his promotion to the position of master mechanic, his prospects of continued employment throughout the construction of the project were greatly enhanced, and his employment became indefinite at that time.

The court finds that Simley's promotion did not render his employment indefinite. When Simley was transferred to the Nekoma site, he was demoted and did not regain the position of master mechanic for some time. Also, he was assigned to work in maintenance during the winter and had no assurance that he would be reassigned as a

master mechanic or in any other position in the spring.

Defendant also relies upon the fact that Simley worked on the project for 24 continuous months and that Frederick worked for 36 continuous months, citing *Boone v. United States*, 482 F.2d 417 (5th Cir. 1973), as authority that employment of such length is indefinite. The court held in *Boone* that a taxpayer who drove the 160 mile round trip to his job at a construction site daily could not deduct his automobile expenses because his job, although it might have been temporary at first, had become indefinite during the taxable year in question. The taxpayer was originally hired as a pipefitter, but after three months he was promoted to welder inspector. The length of his employment was fifteen months. The court found the following facts were determinative of the indefinite nature of his employment:

—It was of such a nature that it could be terminated at any time;

—He had no way of knowing how long it would last when he was hired;

—He was actually employed for over 15 months, well over the one-year "usual line of demarcation between temporary and non-temporary employment," Rev. Rul. 60–189 [1960–1 Cum.Bull. 60, 63];

—According to the taxpayer's testimony his commuting expenses were incurred solely for the convenience of his family; he decided to establish a residence and not move his children about so they could receive an uninterrupted and better education; and

—The indefinite nature of the employment was further indicated by a promotion from pipe fitter to welder inspector within three months of his initial employment, increasing his chances of working until the job ended, as opposed to termination upon the first reduction in work force.

*Id.* at 420.

It is the opinion of this court that the approach taken in *Boone* is not appropriate under the Eighth Circuit test in *Cockrell*. The *Cockrell* test looks to the "prospects" of the length of employment, and not to the actual length of employment after the fact.

■ The court finds that throughout plaintiffs' employment, it was likely that their employment, from any given time, would last only a short time longer. Even after they were retained through the first winter, they could not be reasonably certain that their jobs would still exist the next summer, and when they did ultimately work through that summer, they could not reasonably expect to be retained through the next winter.

Aside from the probability of being laid off at any time, plaintiffs also faced the prospect that the project would be terminated at any time. Because of the unique nature of this government-sponsored project, there was no assurance throughout its construction that it would be completed and placed in operation. In fact, of the ten projected Safeguard projects, only the one in North Dakota reached completion of construction, and it was in operation for only one day.

Therefore, the court finds that plaintiffs' employment at the Safeguard project was temporary throughout their respective terms of employment, and to the extent the amounts claimed have been substantiated, the deductions sought will be allowed.

## III. SUBSTANTIATION

The substantiation requirements for travel expenses are contained in § 274(d) of the Internal Revenue Code, 26 U.S.C. § 274(d), which provides in part:

No deduction shall be allowed—(1) under section 162 or 212 for any travelling expense (including meals and lodging while away from home),

\* \* \* \* \* \*

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel . . , [and] (C) the business purpose of the expense or other item . . . . .

■ The deductions claimed by Louis Frederick for travel expense in 1971 and 1972 were based on the Internal Revenue Service's allowance per mile travelled rather than on actual costs incurred. The fact that Frederick destroyed his receipts for travel costs for those years has no effect on the substantiation issue before the court, since the deductions were not taken on the basis of those records.

Frederick testified that he travelled 162 miles per day and that he worked 248 days in both 1971 and 1972. The testimony of his mother corroborates his testimony that he travelled to and returned home from his job at the Safeguard project each day. His wage and tax statements (W-2 Forms) for 1971 and 1972 reflect as "other compensation" the amounts received in per diem payments for those years. When the figure for each year is divided by the $8.00 payment he received for each day of work, the quotient is 248 days for each year, which corroborates his testimony. Further, the court takes judicial notice pursuant to Rule 201, F.R.Evid., that the distance from Belcourt to the MSR Site near Nekoma is approximately 81 miles, as testified by Frederick.

The gross deductions claimed by Frederick for mileage expenses, i. e., without subtracting the per diem payments, were $3,000.00 in 1971 and $2,976.00 in 1972. The court takes judicial notice pursuant to Rule 201, F.R.Evid., that the maximum mileage deduction allowed by the Internal Revenue Service in 1971 and 1972 was ten cents per mile for the first 15,000 miles and seven cents per mile thereafter. The court finds that the deductions claimed by Frederick for both years are within that maximum allowance.

■ Therefore, the court finds Louis Frederick has met the substantiation requirements of § 274, and concludes the deductions claimed for mileage expenses in 1971 and 1972 are allowable in full, entitling him to the refund sought in this action.

Ingolf Simley claimed deductions for meals, lodging and travel expenses in 1971 and 1972. He was able to produce some records at trial in the form of cancelled checks, but the records substantiating the remainder of his expenses were lost prior to the preparation of the tax returns. The deduction claimed each year was based on an estimate of expenditures of $14.00 per day, less the $8.00 per diem he received. Although his wife testified at trial, she was unable to corroborate any of the expenses.

The court finds the checks produced at trial substantiate the following expenses:

### 1971

| | |
|---|---|
| Room rent | $168.00 |
| Lot rent for travel trailer | $165.00 |
| Bottle gas for trailer | $ 30.42 |
| Trailer title and license | $ 21.00 |
| License and insurance for pickup truck | $ 50.00 |
| Total | $434.42 |

### 1972

| | |
|---|---|
| Lot rent for travel trailer | $ 40.00 |
| Bottle gas for trailer | $ 47.40 |
| Trailer license | $ 15.00 |
| Total | $102.40 |

The court finds the remainder of the cancelled checks do not substantiate the expenses claimed.

Simley has produced several checks payable to the order of Beck's Service for cash. He testified that the cash received in exchange for those checks was used to purchase food and for other living expenses at the jobsite. Without corroborating evidence, these checks are insufficient substantiation of travel expenses.

He has also produced a check written in the amount of $700.00 for the purchase of the travel trailer in which he lived during his employment. He testified that he received $300.00 from the sale of the trailer, but he gave no indication of the date of the sale. Without at least the approximate date of the sale, there is no reasonable basis upon which the court can determine a depreciation allowance on the trailer in the taxable years in question.

Simley testified that he had driven his pickup truck 40,000 miles during his employment, but he had not recorded the mileage for each year. His wife testified that she had not checked either the yearly or total mileage. Without evidence of the

mileage for each year, there is no basis for a deduction for mileage.

■ Since the substantiated expenses for each of the years in question are less than the amounts received in those respective years as per diem for travel and subsistence, the court concludes that no deduction will be allowed for the travel expenses claimed, and Simley is not entitled to the refund sought in this action.

IT IS ORDERED that judgment be entered in Civil No. A2–76–51 for plaintiffs Louis R. Frederick and Yvonne M. Frederick and against defendant United States of America in the amount of $1,282.32, plus statutory interest.

IT IS FURTHER ORDERED that judgment be entered in Civil No. A2–76–52 for defendant United States of America and for dismissal of plaintiffs Ingolf G. Simley and Judith Simleys' complaint and cause of action.